UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| ERIC M. HEWITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:13CV104 ACL |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Plaintiff Eric M. Hewitt's

application for disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401, *et seq.,* and application for supplemental security income

under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* All matters are pending

before the undersigned United States Magistrate Judge, with consent of the parties,

pursuant to 28 U.S.C. § 636(c). Because the Commissioner's final decision is

supported by substantial evidence on the record as a whole, it is affirmed.

### I. Procedural History

On June 30, 2010, Plaintiff Eric M. Hewitt applied for disability insurance

benefits (DIB) and supplemental security income (SSI), claiming he became

disabled on December 29, 2009, because of anxiety, severe attention deficit

hyperactivity disorder (ADHD), anger problems, and learning disability. (Tr. 137-43, 165.) Upon initial consideration, the Social Security Administration denied Hewitt's claims for benefits. (Tr. 74-75, 78-83.) At Hewitt's request, a hearing was held before an administrative law judge (ALJ) on April 23, 2012, at which Hewitt and a vocational expert testified. (Tr. 25-73.) On August 22, 2012, the ALJ issued a decision denying Hewitt's claims for benefits, finding Hewitt able to perform his past relevant work as a trash collector, and alternatively finding that Hewitt could perform other work as it exists in significant numbers in the national economy. (Tr. 8-20.) On September 27, 2013, the Appeals Council denied Hewitt's request to review the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, Hewitt raises numerous claims arguing that the ALJ's decision is not supported by substantial evidence on the record as a whole. Hewitt first claims that the ALJ erred by failing to consider his bipolar disorder and borderline intellectual functioning as severe impairments, and further erred in her evaluation of the evidence when finding Hewitt's mental impairments not to meet a listed impairment. Hewitt also challenges the ALJ's determination of his residual functional capacity (RFC), arguing specifically that the ALJ erred in her credibility determination, failed to accord controlling weight to the opinion of his treating psychiatrist, and failed to provide detailed findings to

support her RFC assessment.  Finally, Hewitt contends that the ALJ erred in her determination that he can perform his past relevant work as a trash collector. Hewitt requests that the final decision be reversed and that he be awarded benefits or that the matter be remanded for further consideration.  For the reasons that follow, the ALJ did not err in her decision.

## II.  Testimonial Evidence Before the ALJ

A.    <u>Plaintiff's Testimony</u>

At the hearing on April 23, 2012, Hewitt testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, Hewitt was twenty-five years of age.  Hewitt is married and has two children, ages one and five or six years old.  Hewitt lives in an apartment with his wife and one-year-old child.  (Tr. 35-36.)  Hewitt went to school through the ninth grade.  He has not earned his GED.  Hewitt can read somewhat.  He has no health insurance.  (Tr. 37.)

Hewitt testified that he worked for two weeks in 2004 as a trash collector. (Tr. 41-42.)  Hewitt testified that this job ended because it was only temporary work.  Hewitt also performed temporary work in a factory in 2006.  (Tr. 62-63.) From August 2007 to December 2009, Hewitt worked as a member of a crew at a McDonald's.  Hewitt testified that he was fired from this job after he became angry and pulled a knife on a coworker.  (Tr. 37-38, 179.)  Hewitt testified that he also

argued with his manager, other coworkers, and customers when he worked at McDonald's. (Tr. 63.) Hewitt testified that he has not looked for work since being fired from McDonald's, because it is difficult for him to get around given that he does not drive and his wife works. (Tr. 40.)

Hewitt testified that he is unable to work because of severe ADHD, which makes it difficult for him to learn things and causes him to always fidget. Hewitt testified that he cannot sit or stand for long periods of time because of his need to move around. (Tr. 49-50.) Hewitt testified that his ADHD makes it difficult for him to focus and to complete tasks. Hewitt testified that he cannot follow the plot of a television show. Hewitt has difficulty reading, because he cannot sit still long enough and does not understand some of the words. (Tr. 55-56.)

Hewitt testified that he also has bipolar disorder and experiences mood swings throughout the day. Hewitt also has "really bad anger" and throws and breaks things when he gets mad. (Tr. 49-50, 57.) Hewitt has "bad days" three or four days a week during which time he sits around, stares at the walls, and ignores everyone. Hewitt lies down for a couple of hours on these days and does not leave the house. (Tr. 58-59.) Hewitt testified that he is unable to care for his one-year-old child while his wife works because of his mental instability. (Tr. 40.)

Hewitt has been seeing a psychiatrist for a couple of years and takes medication for his conditions. The medication is provided by the health center.

Hewitt testified that he takes Methylphenidate (MPH) for ADHD, which helps his impairment, but does not control it. This medication causes no side effects. Hewitt testified that he takes Saphris for bipolar disorder and anger issues, which helps him sleep at night, but causes him to feel groggy in the morning. He no longer takes Seroquel for the conditions. Hewitt testified that his psychiatrist continually adjusts his medication. (Tr. 46-52.) Hewitt also testified that he has been seeing a counselor for about three months and sees him every two weeks for counseling. (Tr. 53-54.)

As to his daily activities, Hewitt testified that he gets up around 10:00 or 11:00 a.m., watches a little television, plays a video game, and helps clean the house a bit. (Tr. 45.) Hewitt testified that he sometimes has interrupted sleep because of restless legs. (Tr. 61.) Hewitt does not drive and has never driven. (Tr. 36.) Hewitt attempted six times to take the test to obtain his permit. (Tr. 56.) Hewitt testified that he does not leave the house unless he is with his wife, because he does not want to get in trouble or do something he is not supposed to do. Hewitt testified that he is not bothered by being in a store, but he does not go shopping because he forgets things. (Tr. 59-61.)

B.   Testimony of Vocational Expert

Barbara Meyers, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Meyers characterized Hewitt's past employment as a fast food worker as unskilled and light, medium as performed; and as a trash collector as unskilled and medium.  (Tr. 67.)

The ALJ asked Ms. Meyers to assume an individual of Hewitt's age and education and who has no exertional limitations.  The ALJ asked Ms. Meyers to further assume the individual to be "limited to simple, routine tasks; only occasional changes in the working setting; only occasional interaction with public or co-workers; and only occasional supervision[.]"  (Tr. 67-68.)  Ms. Meyers testified that such a person could perform Hewitt's past work as a trash collector as well as other work as a laundry worker, of which 2,200 such jobs exist in the State of Missouri and 100,000 nationally; cleaner, of which 1,400 such jobs exist in the State of Missouri and 69,000 nationally; and kitchen helper, of which 15,000 such jobs exist in the State of Missouri and 760,000 nationally.  (Tr. 68-69.)

### III.  Medical and Education Records Before the ALJ

Hewitt underwent an ADHD psychological assessment in May 1994 and was provisionally diagnosed with ADHD.  Dysthymia, anxiety disorder, and oppositional defiant disorder were to be ruled out.  Hewitt was seven years old and in the first grade.  (Tr. 231-34.)

Hewitt attended Columbia Public Schools during his middle and high school years.  He flunked nearly all of his classes in sixth and seventh grade.  In May

2000, while in seventh grade, Hewitt obtained the following IQ scores as measured by the Wechsler Intelligence Scale for Children – Third Edition (WISC-III): verbal-76, performance-79, full scale-76, which placed him in the borderline range of intellectual functioning. Social/Emotional/Behavioral scales completed by Hewitt's teachers consistently placed Hewitt in the "clinically significant" or "at risk" range with multiple reports of threatening others, throwing tantrums, making statements against self, and being verbally and physically aggressive toward others. It was noted that Hewitt's behavior improved somewhat with medication, and specifically, MPH and Clonidine. In eighth grade, Hewitt earned grades ranging from an A- in Physical Science to a D- in Careers. (Tr. 223, 253, 255-57, 268-83.)

Columbia Public Schools reviewed Hewitt's Individual Education Plan (IEP) in May 2002. Hewitt was fifteen years of age and in the ninth grade. It was noted that results from the WISC-III administered on May 4, 2002, showed Hewitt to be functioning in the borderline range of intellectual functioning. Hewitt was noted to have been diagnosed with ADHD and to be in self-contained classrooms for all subjects except Math. During the second term of his ninth grade year, Hewitt earned a C- in Reading and D's and F's in all of his other classes. Hewitt frequently argued with his peers and needed prompting to act appropriately with them. Plans were made for Hewitt's transition into high school. (Tr. 222, 235-47.)

Hewitt withdrew from school in October 2002 because of "lack of interest." He was in the tenth grade. At the time of his withdrawal, Hewitt was earning D's and F's in all of his classes. (Tr. 221-22.)

Between November 1996 and October 2002, Hewitt was suspended from school on thirty-two occasions for harassment/intimidation, insubordination, assault third degree, truancy, vandalism, fighting, classroom disruption, sexual misconduct/harassment, and other unspecified offenses. (Tr. 224-28.)

After October 2002, the record of this case is silent until June 14, 2010, when Hewitt underwent a psychiatric evaluation at Mark Twain Behavioral Health (MTBH). Hewitt was twenty-three years of age. Hewitt reported to APRN Reghnald Westhoff that he was having a lot of problems with anger and breaks things when he is angry. Hewitt reported having had problems with severe ADHD for years and that he has difficulty calming himself down. Hewitt denied any problems with depression. Hewitt reported that he enjoyed building model cars. Mr. Westhoff noted Hewitt not to currently be taking any medications. Hewitt reported that he took Ritalin in the past and that the medication was very helpful in calming him down and helping him stay focused and control his anger. Mental status examination showed Hewitt to be oriented times three. Hewitt was noted to be casually dressed, and his grooming was clean and neat. Hewitt's speech was clear and coherent. His mood was labile and his affect anxious. Mr. Westhoff

noted Hewitt's memory to be variable. Hewitt's concentration and attention were noted to be poor. Hewitt denied any visual or auditory hallucinations and denied any suicidal or homicidal thinking. Mr. Westhoff determined Hewitt's intelligence to be below average to average. Hewitt's motivation was noted to be fair and his insight fair to poor. Hewitt was given provisional diagnoses of generalized anxiety disorder (GAD) and ADHD-combined type. Mr. Westhoff assigned a Global Assessment of Functioning (GAF) score of 45, indicating serious symptoms.[1] Hewitt was given samples of Strattera and was prescribed Trazodone for sleep. He was instructed to follow up in one month. (Tr. 336-38.)

Hewitt returned to MTBH on August 30, 2010, and reported that he was not getting along with his wife. Hewitt reported that Strattera caused nausea, but he continued to want treatment for ADHD. Hewitt reported feeling "wired." Hewitt also reported that he was doing odd jobs. Hewitt's sleep and appetite were noted to be good. No aggression was noted. The efficacy of Hewitt's medication was noted to be fair. Mr. Westhoff continued Hewitt in his diagnoses of GAD and ADHD and assigned a GAF score of 55, indicating moderate symptoms. Antisocial personality disorder was to be ruled out. Hewitt was instructed to restart Strattera and to follow up with Dr. Goldman in two months. (Tr. 340.)[2]

---

[1] *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. 2000 Text Revision).

[2] This medical note is also signed by a physician, although the signature is illegible.

On September 16, 2010, Michael Stacy, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that Hewitt's ADHD and GAD caused Hewitt to experience mild limitations in activities of daily living; moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration. (Tr. 341-52.)

In a Mental RFC Assessment completed that same date, Dr. Stacy opined that Hewitt was moderately limited in his ability to understand and remember detailed instructions, but otherwise was not significantly limited in the domain of Understanding and Memory. In the domain of Sustained Concentration and Persistence, Dr. Stacy opined that Hewitt was moderately limited in his ability to carry out detailed instructions and maintain attention and concentration for extended periods, but otherwise was not significantly limited. In the domain of Social Interaction, Dr. Stacy opined that Hewitt was moderately limited in his ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. Dr. Stacy expressed no opinion as to Hewitt's ability to get along with coworkers or peers. Dr. Stacy further opined that Hewitt was not significantly limited in his ability to ask simple questions or request assistance, or in his ability to maintain socially appropriate

behavior and adhere to basic standards of neatness and cleanliness. In the domain

of Adaptation, Dr. Stacy opined that Hewitt was moderately limited in his ability to

respond appropriately to changes in the work setting, but otherwise was not

significantly limited. Dr. Stacy concluded that Hewitt had the ability to understand

and remember simple instructions; could carry out simple work instructions,

maintain adequate attendance, and sustain an ordinary work routine without special

supervision; could interact adequately with peers and supervisors in a setting with

limited social demands; and could adapt to most usual changes common to a

competitive work setting. (Tr. 353-55.)

Hewitt visited Dr. David Goldman at MTBH on October 25, 2010, and

reported that Strattera did not help his condition in that he continued to feel

"hyper" and "bounc[e] off the walls." Hewitt reported continued difficulty falling

asleep and that he could not afford the Trazodone that was prescribed for the

problem. Hewitt requested that MPH and Clonidine be prescribed, given that they

were effective for him in the past. Hewitt reported his appetite to be good. No

side effects from his medication were noted. Dr. Goldman determined Hewitt to

have had minimal response to medication. Hewitt was noted not to exhibit any

aggression. Mental status examination was normal in all respects, with Hewitt

noted to exhibit a normal appearance as well as normal behavior, affect, thought

processes, insight, judgment, cognition, and impulse control. Dr. Goldman

diagnosed Hewitt with GAD and ADHD-combined type. Hewitt was instructed to taper off of Strattera for a period of nine days, after which MPH and Clonidine would be started. (Tr. 370.)

Four weeks later, on November 22, 2010, Hewitt reported to Dr. Goldman that he had filled his medication that same date. Hewitt reported his sleep to be good. Mental status examination was unchanged from the previous visit. Hewitt was continued in his diagnoses and was instructed to continue with his current medication regimen of MPH and Clonidine, which he had just begun. (Tr. 369.)

On January 10, 2011, Hewitt reported to Dr. Goldman that he did not think the medication was working. Hewitt also reported concerns regarding restless leg syndrome. Dr. Goldman continued in his diagnoses of GAD and ADHD and instructed Hewitt to increase his dosage of MPH. (Tr. 368.) On March 10, Hewitt reported that he was doing better, and Dr. Goldman noted that Hewitt had a good response to his medication. Mental status examination remained normal in all respects. Hewitt was continued in his diagnoses and on his current medication regimen. (Tr. 367.)

Hewitt returned to Dr. Goldman on July 26, 2011, and reported that he ran out of his medication and did not fill his last prescriptions, because he could not afford them. Hewitt reported having mood swings, which his wife confirmed. Hewitt questioned whether he had bipolar disorder. Mental status examination

remained normal in all respects. Hewitt was continued on his medications, and Abilify was also prescribed. Bipolar disorder was to be ruled out. (Tr. 366.)

On September 21, 2011, Hewitt reported to Dr. Goldman that he was "not so good" and complained that his medication wore off too quickly. Dr. Goldman noted Hewitt to have had a fair to good response to medication, with no side effects reported. Mental status examination remained normal. Hewitt was continued in his diagnoses of GAD and ADHD. Bipolar disorder was to be ruled out. Hewitt's dosages of MPH and Abilify were increased. (Tr. 365.) On September 26, Hewitt's wife reported that Hewitt's mood swings were better. Hewitt was continued in his diagnoses and on his current medication regimen. Bipolar disorder was to be ruled out. (Tr. 364.)

On September 26, 2011, Dr. Goldman completed a Mental Medical Source Statement of Ability to Do Work-Related Activities (Mental MSS) (Tr. 358-60) in which he opined that Hewitt was extremely limited in his ability to understand, remember, and carry out complex instructions and in his ability to make judgments on complex work-related decisions. Dr. Goldman further opined that Hewitt was markedly limited in his ability to understand, remember, and carry out simple instructions and to make judgments on simple work-related decisions. Dr. Goldman explained that "due to patient's [ADHD] and compromised cognitive skills (memory defects), [he] is not able to remember, follow, or perform

instructions or make decisions." (Tr. 358.) With respect to social interaction, Dr. Goldman opined that Hewitt was markedly to extremely limited in his ability to interact appropriately with the public, supervisors, and coworkers as well as in his ability to respond appropriately to usual work situations and to changes in a routine work setting, explaining that Hewitt was unable to accept criticism and was easily irritated and frustrated. Dr. Goldman explained further: "Due to patient's mood fluctuation, lability, and instability (bipolar d/o), [he] is easily frustrated, irritated, and aggravated. [He] is not able to deal with changes in routine or environment." Dr. Goldman stated further that Hewitt was not able to function in a work environment "even with medication." Dr. Goldman reported that Hewitt's mood fluctuations were caused by his bipolar disorder; that his inability to focus and concentrate was caused by his ADHD; and that his inability to deal with change was caused by his anxiety disorder. Dr. Goldman agreed that Hewitt's disability began on December 29, 2009. (Tr. 359.)

On January 10, 2012, Hewitt reported to Dr. Goldman that he had not taken Clonidine for at least one month and was experiencing mood swings. Hewitt also reported having poor sleep. Mental status examination remained normal in all respects. Dr. Goldman noted Hewitt to have overdosed on Clonidine, and the medication was discontinued. Hewitt was prescribed Seroquel and was instructed to discontinue Abilify. (Tr. 363.)

On March 6, 2012, Hewitt reported weight gain and that Seroquel made him feel weird in the morning. Hewitt was continued in his diagnoses of GAD and ADHD. Bipolar disorder was to be ruled out. Hewitt was instructed to continue with MPH. Saphris was prescribed. (Tr. 362.)

On June 1, 2012, Dr. Goldman reported that his responses given in the September 2011 Mental MSS remained the same given that Hewitt's symptoms remained the same. (Tr. 372-74.)

## IV. The ALJ's Decision

The ALJ found that Hewitt met the insured status requirements of the Social Security Act through December 31, 2013, and that Hewitt had not engaged in substantial gainful activity since December 29, 2009, the alleged onset date of disability. The ALJ found Hewitt's GAD and ADHD to be severe impairments, but that Hewitt did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-14.) The ALJ determined that Hewitt had the RFC to perform work at all exertional levels, but with non-exertional limitations to "simple, routine tasks with only occasional changes in the work setting, only occasional interaction with the public and coworkers, and only occasional supervision." (Tr. 15.) The ALJ found Hewitt able to perform his past relevant work as a trash collector. Alternatively, the ALJ found vocational expert

testimony to support a finding that, with his age, education, work experience, and RFC, Hewitt could perform other work as it existed in significant numbers in the national economy, and specifically, laundry worker, cleaner, and kitchen helper. The ALJ thus found that Hewitt was not under a disability from December 29, 2009, through the date of the decision.  (Tr. 19-20.)

## V.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a

five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v.*

*Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding

whether the claimant is engaged in substantial gainful activity. If the claimant is

working, disability benefits are denied. Next, the Commissioner decides whether

the claimant has a "severe" impairment or combination of impairments, meaning

that which significantly limits his ability to do basic work activities. If the

claimant's impairment(s) is not severe, then he is not disabled. The Commissioner

then determines whether claimant's impairment(s) meets or equals one of the

impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's

impairment(s) is equivalent to one of the listed impairments, he is conclusively

disabled. At the fourth step, the Commissioner establishes whether the claimant

can perform his past relevant work. If so, the claimant is not disabled. If the

claimant is found unable to perform such past work, the Commissioner evaluates

various factors to determine whether the claimant is capable of performing any

other work in the economy. If not, the claimant is declared disabled and becomes

entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by

substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir.

2002). Substantial evidence is less than a preponderance but enough that a

reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence

which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, substantial evidence on the record as a whole supports the ALJ's decision in this cause.

A.    <u>Severe Impairments</u>

Hewitt claims that the ALJ erred at Step 2 of the sequential analysis by failing to consider his borderline intellectual functioning and bipolar disorder to be severe impairments. To the extent the ALJ's failure to identify these impairments as severe impairments can be considered error, such error was harmless.

Where an ALJ errs by failing to find an impairment to be severe, such error is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at

the other steps of the process. *See Coleman v. Astrue*, No. 4:11CV2131 CDP, 2013 WL 665084, at *10 (E.D. Mo. Feb. 23, 2013). At Step 2 of the sequential analysis here, the ALJ found Hewitt to have severe impairments, and specifically GAD and ADHD, but found Hewitt's bipolar disorder and borderline intellectual functioning not to be severe. (Tr. 13-14.) Continuing in the evaluation process, however, the ALJ considered the effects of these impairments and, indeed, the RFC assessment reflected such effects.

Subsequent to Step 2, the ALJ discussed Hewitt's claimed bipolar disorder, specifically noting Hewitt's reports to Dr. Goldman that he experienced mood swings, Dr. Goldman's provision of treatment in response to such reports, Hewitt's wife's reports of improvement in mood swings with treatment, and Dr. Goldman's observations of Hewitt's behavior. The ALJ's RFC assessment contained significant social limitations that restricted plaintiff's contact with others and accounted for limited changes in work settings. In her decision, the ALJ stated that this RFC would not change even if Hewitt's bipolar disorder were considered to be severe. (Tr. 13.) Given that the ALJ included the effects of Hewitt's claimed bipolar disorder in her overall analysis, her failure to find the condition to be a severe impairment at Step 2 was harmless. *See Maziarz v. Secretary of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010); *see also Chavez v. Astrue*, 699 F. Supp. 2d 1125,

1133 (C.D. Cal. 2009). This is especially true here where the ALJ included such effects in the RFC assessment. *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (Commissioner required to consider any non-severe impairments when determining RFC); *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (ALJ must consider combined effects of severe and non-severe impairments).

The same holds true for Hewitt's borderline intellectual functioning. Although the ALJ determined at Step 2 that this impairment was not severe, she considered the effects of this impairment as she proceeded through the remainder of her analysis. The ALJ specifically discussed Hewitt's school records, his performance on IQ tests, the effect of medication on his study skills, his ability to maintain employment at McDonald's for two years, and his current difficulty with reading. In addition, as noted by the ALJ, Hewitt's borderline intellectual functioning was accommodated in the RFC assessment with the limitation to simple, routine tasks with only occasional changes in the work setting. Such RFC limitations adequately account for a claimant's borderline intelligence. *See Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir. 2001). Inasmuch as the ALJ included the effects of Hewitt's borderline intellectual functioning in her overall analysis and accounted for its effects in the RFC assessment, her failure to find the condition to be a severe impairment at Step 2 was harmless. *See Maziarz,* 837 F.2d at 244; *Lorence,* 691 F. Supp. 2d at 1028; *see also Chavez,* 699 F. Supp. 2d at

1133; *Coleman,* 2013 WL 665084, at *10.

B.    Listed Impairments

Hewitt claims the ALJ erred by failing to find his mental impairments not to

meet a listed impairment, and specifically, Listings 12.02, 12.04, and 12.06.

Hewitt contends that the ALJ reached this erroneous result by addressing only that

evidence that supported her finding of non-listing level severity and by improperly

discounting Dr. Goldman's opinion that Hewitt suffered extreme and marked

limitations.

Section 12.00 of the Listings of Impairments governs the evaluation of

disability on the basis of mental disorders.  For Listings 12.02, 12.04, and 12.06, a

claimant must show that his mental impairment meets "paragraph B" criteria, that

is, that it results in at least two of the following:

1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or
    pace; or
4.  Repeated episodes of decompensation, each of extended duration.

A marked limitation "means more than moderate but less than extreme" and "may

arise when several activities or functions are impaired, or even when only one is

impaired, as long as the degree of limitation is such as to interfere seriously with

your ability to function independently, appropriately, effectively, and on a

sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(C). To meet

a listed impairment, the claimant must show that he meets all of the Listing's

criteria. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).

In her written decision here, the ALJ found Hewitt not to have any marked

limitations, but instead to have mild restrictions in activities of daily living;

moderate difficulties in social functioning; moderate difficulties in concentration,

persistence, or pace; and to have had no episodes of decompensation of an

extended duration. (Tr. 14.) Although Hewitt's treating psychiatrist opined that

Hewitt experienced marked and extreme limitations in such domains, the ALJ

properly determined to accord little weight to this opinion. (*See* Sec. V.C.2, *infra.*)

For the following reasons, substantial evidence on the record as a whole supports

the ALJ's findings that Hewitt's limitations in all domains are less than marked.

With respect to activities of daily living, § 12.00 of the Listings directs the

Commissioner to consider adaptive activities such as cleaning, shopping, cooking,

taking public transportation, paying bills, maintaining a residence, caring

appropriately for grooming and hygiene, using telephones and directories, and

using a post office. § 12.00(C)(1). Finding Hewitt to have mild restrictions in this

domain, the ALJ specifically noted that Hewitt helps his wife clean the house and

is able to go shopping despite his claim that he forgets things. The record also

shows that Hewitt was observed to have a normal appearance at all of his

appointments with Dr. Goldman and was clean and neatly groomed at his first appointment at MTBH in 2010.  In addition, Hewitt's wife reported in her Third Party Function Report that Hewitt had no problems with personal care, helped prepare meals, paid bills, and performed chores such as mowing the lawn and taking out the trash.  (Tr. 171-78.)  Although the record shows Hewitt to need reminders to take his medication in the morning (*id.*), there nevertheless is substantial evidence demonstrating that, while limited, Hewitt does not experience limitations in his daily activities to such degree as to interfere seriously with his ability to function independently, appropriately, effectively, and on a sustained basis, as shown by his activities described above and set out in the record.  To the extent Hewitt contends that the ALJ failed to consider his testimony that he does nothing on his "bad days" (*see* Pltf.'s Brief, Doc. 15 at 8), a review of the ALJ's decision shows the contrary.  (Tr. 16.)  As discussed *infra*, however, the ALJ properly determined Hewitt's testimony not to be consistent with the evidence. (*See* Sec. V.C.1, *infra.*)  The ALJ did not err in finding Hewitt's limitations in his activities of daily living to be less than marked.

With respect to social functioning, § 12.00 directs the Commissioner to consider the claimant's capacity to interact with and get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  The capacity for such interaction may be exhibited by a history of altercations, firings,

or social isolation as well as evidence of initiating social contact, participating in group activities, or communicating clearly with others. *See*, § 12.00(C)(2). Here, the ALJ found Hewitt to be moderately limited in this domain, specifically noting Hewitt's anger issues and ADHD symptoms to affect his relevant functioning. This finding is supported by substantial evidence. As noted by the ALJ, Dr. Goldman consistently observed Hewitt to exhibit normal behaviors during all of his appointments and to display no aggressiveness. In addition, the record shows Hewitt's wife to report that she and Hewitt play cards together, take rides, watch television, and visit family. She also reported that Hewitt is able to go out alone and shop for clothes and food. (Tr. 171-78.) Although Hewitt testified that his shopping is limited by his difficulty remembering things, he also testified that being around people while shopping did not bother him. These activities support the ALJ's finding that Hewitt's limitations in social functioning are less than marked. The ALJ acknowledged Hewitt's difficulty dealing with the public and noted that Hewitt engaged in altercations while at work. The record also shows Hewitt to have angered easily and to have argued with his wife and family. Such circumstances were reported to have occurred, however, prior to Hewitt beginning mental health treatment in 2010. *E.g.*, *Blackburn*, 761 F.3d at 859-60. As such, while the record shows Hewitt to experience limitations in social functioning, the ALJ did not err in finding them not to rise to the level of marked limitations.

Although not all the evidence "pointed in that direction," there nevertheless was a sufficient amount that did. *See Moad v. Massanari*, 260 F.3d 887, 891 (8th Cir. 2001).

With respect to concentration, persistence, or pace, the Commissioner must consider the claimant's ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. § 12.00(C)(3). In this domain, the ALJ determined Hewitt to have moderate difficulties, again noting Hewitt's anger issues and ADHD to affect his relevant abilities. The ALJ specifically noted that Hewitt experienced problems in this domain as a child and that such problems improved with medication. Hewitt was not taking any medication when he first sought treatment as an adult and, indeed, upon beginning treatment, his GAF score rose from 45 to 55 indicating an improvement from serious symptoms to moderate. After four months of treatment, Hewitt's mental status was normal in all respects, with Dr. Goldman noting Hewitt to have normal thought processes, insight, judgment, and cognition. Repeated mental status examinations showed Hewitt to continue to exhibit normal behavior throughout his treatment with Dr. Goldman. The ALJ noted Hewitt's testimony that he cannot watch television because of his inability to concentrate, but also noted that plaintiff testified that he plays video games, which requires a level of concentration. The record also shows Hewitt to

play cards, build model cars, and perform "odd jobs." There is a sufficient amount of evidence to support the ALJ's decision that while limited, Hewitt does not experience limitations to such a degree to be considered markedly limited in concentration, persistence, or pace. Upon review of the record as a whole, it cannot be said that the ALJ's findings are not supported by substantial evidence.

Finally, Hewitt does not claim that he experienced repeated episodes of decompensation of an extended duration, and the record does not reveal any such episodes.

Because substantial evidence on the record as a whole supports the ALJ's determination that Hewitt's mental impairments did not meet the Part B criteria for mental disorders under Listing 12.00, she did not err when she found Hewitt's mental impairment not to meet a listed impairment.

C.    RFC Determination

A claimant's RFC is the most he is able to do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945; *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, including medical records, the observations of treating physicians and others, and the claimant's description of his limitations. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002); *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th

Cir. 2001); *Dunahoo*, 241 F.3d at 1039 (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  As such, when determining a claimant's RFC, the ALJ must necessarily evaluate the credibility of the claimant's subjective complaints.  *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).  In addition, because a claimant's RFC is a medical question, "the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  *Hutsell*, 259 F.3d at 712.  The burden to prove the claimant's RFC rests with the claimant and not the Commissioner.  *Pearsall*, 274 F.3d at 1217.

1.   *Credibility*

In determining a claimant's credibility, the ALJ must consider all evidence relating to his complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).  While an ALJ need not explicitly discuss each *Polaski* factor in her decision, she nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints.  *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider his subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson,* 363 F.3d at 738-39. It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in her decision that she considered all of the evidence. *Id.* at 738; *see also Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel,* 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez,* 403 F.3d at 957; *Pearsall*, 274 F.3d at 1218.

A review of the ALJ's decision shows her to have set out numerous inconsistencies in the record upon which she found plaintiff's subjective complaints not to be entirely credible. First, the ALJ noted Hewitt's symptoms to improve with medication and that Hewitt himself and his wife reported such improvement to Dr. Goldman. The record also shows that Hewitt's reported episodes of exacerbation occurred during periods when he was not on medication, including times when he did not fill his prescriptions. *See Roth v. Shalala*, 45 F.3d

279, 282 (8th Cir. 1995) (impairments that are amenable to treatment do not support a finding of disability). The ALJ also noted that Hewitt consistently exhibited normal behavior during numerous mental status examinations. Indeed, Dr. Goldman's treatment notes reported no objective signs of psychological problems, including during periods when Hewitt was not taking medication. *See, e.g., Halverson,* 600 F.3d at 933 (claimant's credibility properly discounted where multiple examinations showed no abnormalities). The ALJ also noted Dr. Goldman to consistently report that Hewitt experienced no side effects from his medications. To the extent the record shows Hewitt to have nevertheless reported that he experienced nausea with Strattera and weight gain and feeling "weird" with Seroquel, the undersigned notes that these medications were discontinued after Hewitt's limited use of them and Hewitt made no complaints of side effects thereafter. *See Perkins v. Astrue*, 648 F.3d 892, 901 (8th Cir. 2011) (adverse side effects eliminated with changes in type of medication). Substantial evidence on the record as a whole supports these findings.

Hewitt contends that the ALJ's finding that he "did not work enough" was an improper basis to discount his credibility inasmuch as his limited work history is attributable to his mental illness. (Pltf.'s Brief, Doc. #15 at p. 13.) Hewitt's claim is without merit. In her written decision, the ALJ noted that Hewitt's jobs as a trash collector and doing factory work ended on account of their temporary

nature and not on account of his impairments. (Tr. 18.) This is an appropriate consideration in determining a claimant's credibility. *See, e.g., Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998) (credibility offset by claimant being laid off from her job instead of leaving on account of impairments). The ALJ also addressed Hewitt's two-year work history at McDonald's and acknowledged the inter-personal problems Hewitt experienced while working there. Although the ALJ considered Hewitt's young age to make it "difficult to gauge whether his work history in and of itself is suggestive of a lack of motivation to work" (Tr. 18), it cannot be said that this consideration led to the ALJ finding that Hewitt did not work enough, as argued by Hewitt.

Hewitt also argues that the ALJ overstated and misstated his daily activities in her adverse credibility determination, specifically noting that the ALJ's statement that Hewitt watches television and "reads some during the day" (Tr. 18) is an inaccurate assessment of his testimony. Hewitt fails to acknowledge, however, that the ALJ also recognized that Hewitt testified that he had difficulty with these activities and addressed these claimed difficulties in the context of Hewitt's ability to concentrate. Specifically, the ALJ found that, despite these difficulties, Hewitt nevertheless was able to play video games – which requires a level of concentration – and also demonstrated an adequate ability to concentrate and pay attention during the fifty-minute administrative hearing. (*Id.*) The ALJ's

consideration of Hewitt's claimed inability to concentrate with reading or television in conjunction with his demonstrated ability to concentrate on other tasks and during other activities was not improper.  In addition, given the numerous other inconsistencies in the record upon which the ALJ relied in finding Hewitt's credibility to be lacking, it cannot be said that the ALJ unduly relied on her observations of Hewitt at the administrative hearing in making her credibility determination.  *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008); *Breyfogle v. Colvin*, No. 2:13-CV-59 CEJ, 2014 WL 4230898, at *13 (E.D. Mo. Aug. 26, 2014) (citing *Smith v. Shalala*, 987 F.2d 1371, 1375 (8th Cir. 1993); *Cline,* 939 F.2d at 568).

Finally, Hewitt argues that the ALJ improperly discounted third party statements made by Hewitt's wife and sister-in-law.  (*See* Tr. 191-93, 195-97.)  In her decision, the ALJ discounted these statements, finding them not to be supported by the medical evidence of record nor rendered by persons medically trained to make "exacting observations" as to the significance of signs, symptoms, and behaviors.  (Tr. 19.)  The ALJ further determined not to credit these third party witnesses given that, by their relationship with Hewitt, they may be influenced by their affection for him and their natural tendency to agree with his claims.  The ALJ did not err in this determination.  *See Perkins,* 648 F.3d at 901.

Accordingly, in a manner consistent with and as required by *Polaski*, the ALJ considered Hewitt's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from his credibility. Because the ALJ's determination not to credit Hewitt's subjective complaints is supported by good reasons and substantial evidence, the Court defers to this determination. *McDade v. Astrue*, 720 F.3d 994, 998 (8th Cir. 2013); *Renstrom v. Astrue,* 680 F.3d 1057, 1065 (8th Cir. 2012).

2. *Opinion Evidence*

Upon concluding that Hewitt's subjective complaints were not entirely credible, the ALJ turned to the September 2011 Mental MSS completed by Hewitt's treating psychiatrist, Dr. Goldman, and accorded it little weight, finding it to be inconsistent with his own treatment notes and observations. The ALJ also noted that Dr. Goldman's opinion was based in part on Hewitt's subjective report that he suffered from bipolar disorder rather than on his diagnosis of the condition. (Tr. 17-18.) For the following reasons, the ALJ did not err in according little weight to Dr. Goldman's opinion.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii). The Regulations require that more weight be given to the

opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)*; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c). The

Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, the ALJ properly discounted Dr. Goldman's September 2011 Mental MSS inasmuch as it was inconsistent with his own treatment notes. This finding is supported by substantial evidence on the record as a whole. As noted by the ALJ, the record shows that throughout his treatment with Dr. Goldman, Hewitt presented with consistently normal mental status examinations. Where a treating psychiatrist's contemporaneous treatment notes show a claimant to exhibit no abnormalities during mental status examinations, an ALJ does not err in discounting that psychiatrist's opinion that the claimant suffers from disabling symptoms. *See Halverson,* 600 F.3d at 930; *see also Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (ALJ may justifiably discount treating physician's opinion when it is inconsistent with their own clinical treatment notes).

In addition, the ALJ noted that Dr. Goldman attributed many of Hewitt's limitations to bipolar disorder, which was an impairment that Hewitt subjectively reported and was never diagnosed by Dr. Goldman or any other treatment provider on or before the Mental MSS was completed in September 2011. A review of Dr. Goldman's treatment notes shows that, while he consistently provided Hewitt with affirmative diagnoses of ADHD and GAD, his reference to bipolar disorder was to

rule out the condition.  As noted by the Eighth Circuit in *Byes v. Astrue*, 687 F.3d 913 (8th Cir. 2012), a "rule out" disorder is one that is suspected but not confirmed.  *Id.* at 916 n.3.  The ALJ's determination to discount Dr. Goldman's opinion to the extent it was based on Hewitt's subjective reports and not on a confirmed impairment was not error.  *Renstrom,* 680 F.3d at 1064; *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011).

Because the ALJ's determination to accord little weight to Dr. Goldman's Mental MSS is supported by good reasons and substantial evidence, the Court defers to this determination.

3.      *Detailed RFC Findings*

Hewitt's claim that the ALJ failed to make detailed findings to support her RFC assessment is without merit.  A review of the ALJ's decision shows her to have thoroughly discussed specific medical facts, nonmedical evidence, and the consistency of such evidence when viewed in light of the record as a whole and to have assessed Hewitt's RFC based on the relevant, credible evidence of record. *Accord* SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). Because the record contains some medical evidence that supports the RFC and substantial evidence on the record as a whole supports the determination, the ALJ did not err.  *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003); *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam).

D.    Past Relevant Work

Hewitt claims that the ALJ erred in her determination that he can perform his past relevant work as a trash collector inasmuch as this work was performed for only two weeks and thus cannot be considered "relevant work" under the Regulations.  Hewitt further argues that the ALJ failed to undergo the required analysis relating to the mental and physical demands of past work to determine whether Hewitt had the RFC to perform such work.  Because any alleged error committed by the ALJ in her finding that Hewitt is able to perform past relevant work was harmless, at most, remand is not required and Hewitt's argument to the contrary must fail.

As an initial matter, the undersigned notes that the ALJ satisfied her duty to examine the specific demands of Hewitt's past work as a trash collector by referring to its job description in the *Dictionary of Occupational Titles* (DOT). (Tr. 19.)  *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013).  The ALJ erred, however, when she considered such work to be "past relevant work" under the Regulations.

Generally, to be considered "past relevant work," the work must have been performed within the past fifteen years; it must have lasted long enough for the claimant to have learned to do it; and it must have been "substantial gainful activity."  *Terrell v. Apfel*, 147 F.3d 659, 661 (8th Cir. 1998); 20 C.F.R. §§

- 37 -

404.1565(a), 416.965(a).  The DOT describes the job of trash collector as unskilled work with a specific vocational preparation (SVP) time of 2, meaning that the time frame within which the work can generally be learned is "[a]nything beyond short demonstration up to and including 1 month."  DOT 381.687-018, 1991 WL 673258.  *See Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998) (discussing skill levels according to the SVP).  The Regulations define unskilled work as work "a person can usually learn to do . . . in 30 days[.]"  20 C.F.R. §§ 404.1568(a), 416.968(a).  The Hewitt here performed temporary work as a trash collector for two weeks.  There is nothing in the record demonstrating that two weeks was long enough for Hewitt to have learned this unskilled work that, by definition, could take up to thirty days to learn.  Because there is no evidence in the record to support the ALJ's finding that Hewitt's past work as a trash collector could be considered "past relevant work" for purposes of determining disability, the ALJ erred when she found that it did.  For the following reasons, however, such error was harmless.

Although the ALJ found at Step 4 of the analysis that Hewitt could perform his "past relevant work" as a trash collector, she nevertheless continued in her analysis and alternatively found at Step 5 that Hewitt could perform other work as it exists in significant numbers in the national economy, and specifically, laundry worker, cleaner, and kitchen helper.  Hewitt makes no challenge to this Step 5

determination. Accordingly, to the extent the ALJ committed any error at Step 4 of the sequential analysis, such error was harmless inasmuch as the ALJ made an alternative finding at Step 5 that Hewitt could perform other work in the national economy. While this portion of the ALJ's decision is not a model of clarity, it demonstrates merely a deficiency in opinion-writing technique that had no bearing on the result. *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008). As such, remand is not warranted.

E.       Additional Evidence Submitted to the District Court

Attached to Hewitt's Brief in Support of the Complaint are medical records from Dr. Goldman dated May 9, June 1, and August 9, 2012. (*See* Pltf.'s Brief, Doc. 15 at 19-21.) Hewitt avers that he obtained these records after the ALJ's decision and submitted them to the Appeals Council, but that they are not included in the administrative record filed with this Court. *Id.* at 6. Hewitt does not contend that the Appeals Council failed to review the records. Nor does he request that the matter be remanded for determination as to whether the Appeals Council in fact considered them. Instead, without argument or support, Hewitt appears to consider these records as part of the evidence this Court must review in determining whether the ALJ's decision is supported by substantial evidence on the record as a whole. If indeed the Appeals Council considered such evidence, Hewitt's assumption would be correct. *Frankl v. Shalala,* 47 F.3d 935, 939 (8th Cir. 1995);

*Richmond v. Shalala,* 23 F.3d 1441, 1444 (8th Cir. 1994).

The Commissioner addresses this new evidence and likewise appears to base her argument on the assumption that this Court will review the evidence to determine whether the ALJ's decision continues to be supported by substantial evidence. The Commissioner raises no argument that these records are improperly before the Court nor questions the Hewitt's representation that the records were before the Appeals Council when it determined not to review the ALJ's decision. (*See* Deft.'s Brief, Doc. 23 at 7-8.)

A review of the administrative record shows the Appeals Council to have acknowledged receipt of counsel's brief summarizing Hewitt's arguments for appeal (*see* Tr. 1-5, 206-15), but there is no indication in the record that the additional medical evidence itself was in fact received or reviewed by the Appeals Council. Indeed, counsel's brief to the Appeals Council is unclear in this regard, given its reference to specific notes in the additional records, but also stating that the "updated medical records will be submitted to the Appeals Council as soon as possible" and "were not provided . . . in a timely manner . . . to allow us to include them in this appeal." (Tr. 206.) Nevertheless, upon review of the records themselves, the undersigned finds that the ALJ's decision continues to be supported by substantial evidence on the record as a whole. *Cf. Box v. Shalala*, 52 F.3d 168, 172 (8th Cir. 1995) (upon consideration of new evidence that was not

reviewed in substance by Appeals Council, district court found the ALJ's decision to continue to be supported by substantial evidence).

In May and June 2012, Hewitt reported to Dr. Goldman that he felt his condition was worsening. In May, Hewitt reported that Saphris made him feel weird, and Dr. Goldman noted that Hewitt was taking only MPH. Cymbalta was prescribed. Hewitt reported during his June appointment that he had an episode the previous day wherein he became angry and "flipped out," but did not break things. Dr. Goldman added Geodon to Hewitt's medication regimen. In August, Dr. Goldman noted that Hewitt was taking no medication. Hewitt reported that MPH and Cymbalta did not work and that Geodon made him feel weird. Samples of Latuda were given. Notably, during each of these visits, Dr. Goldman observed Hewitt's mental status to be normal in all respects with normal appearance, behavior, activity level, orientation, speech, affect, thought processes, insight, judgment, cognition, and impulse control. At no time did Hewitt exhibit any aggressiveness, psychosis, or risk to others. He further reported having no suicidal or homicidal ideations, no delusions, and no hallucinations. In May, bipolar disorder continued to be a condition to be ruled out. In June and August, however, Dr. Goldman's impressions included "R/O [rule out] Bipolar D/O – Bipolar D/O." (Pltf.'s Brief, Doc. 15 at 19-21.)

Hewitt argues that his worsening symptoms and continued need for medication adjustment as documented in these records show that his bipolar disorder was not well-controlled. Hewitt also argues that these records show that bipolar disorder was confirmed as a diagnosis in June 2012. As with the evidence that was before the ALJ, however, Hewitt's complaints of worsening symptoms coincide with his failure to take medication as prescribed and, indeed, he was taking no medication when he saw Dr. Goldman in August. Further, despite Hewitt's subjective claims of worsening symptoms during this period, his mental status examinations continued to remain normal in all respects. Finally, to the extent Hewitt contends that his bipolar disorder was confirmed as a diagnosed condition in June 2012, such circumstance does not change the bases for the ALJ to discount Dr. Goldman's September 2011 Mental MSS given that at the time he completed the Mental MSS, Dr. Goldman attributed Hewitt's limitations in part to bipolar disorder – a condition that was not diagnosed at that time and appeared to be based only on Hewitt's subjective complaints.

Accordingly, upon consideration of the new evidence submitted by Hewitt to this Court, the Court finds the ALJ's determination to continue to be supported by substantial evidence on the record as a whole. While evidence in the record may also support a different conclusion, a reasonable person could find the evidence adequate to support the ALJ's decision and it must therefore be affirmed. *Gates v.*

*Astrue,* 627 F.3d 1080, 1082 (8th Cir. 2010)*; see also Owen v. Astrue*, 551 F.3d 792, 797-98 (8th Cir. 2008) (ALJ's decision not to be reversed if it falls within "available zone of choice").

## VI. Conclusion

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Id.* Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. *Id.*; *see also Buckner,* 646 F.3d 549, 556 (8th Cir. 2011); *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

For the reasons set out above on the claims raised by Hewitt on this appeal, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination that Hewitt was not disabled. Because substantial evidence on the record as a whole supports the ALJ's decision, it must be affirmed. *Davis,* 239

F.3d at 966.  This Court may not reverse the decision merely because substantial evidence exists that may support a contrary outcome.  Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and this case is **DISMISSED**.

A separate Judgment in accordance with Memorandum and Order is entered herewith.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of March, 2015.